Elliot D. Sass v. Commissioner.
Sass v. Commissioner
Docket No. 44652.
United States Tax Court
T.C. Memo 1954-212; 1954 Tax Ct. Memo LEXIS 41; 13 T.C.M. (CCH) 1091; T.C.M. (RIA) 54317; November 30, 1954, Filed *41 During 1946, petitioner earned and was paid from sources without the United States while working in Europe, principally France, certain sums of money. None of this income was paid by the United States or any agency thereof. Held, petitioner was a bona fide resident of France during 1946 and the income is exempt from tax under section 116(a)(1), Internal Revenue Code of 1939. Burlin B. Hamer, 22 T.C. 343, followed. Victor Feingold, Esq., 509 Madison Avenue, New York, N. Y., for the petitioner. Arthur L. Nims, Esq., for the respondent. VAN FOSSAN Memorandum *42 Findings of Fact and Opinion Respondent determined deficiencies and additions to the tax in petitioner's income tax, as follows: 25 per cent
50 per cent
Year
Amount
Penalty
Penalty
1946
$32,013.61
$8,003.40
$16,006.80
1947
207.22
Respondent abandoned his determination of a 50 per cent fraud penalty in the amount of $16,006.80 and introduced no evidence thereon. The main issue presented is whether or not petitioner was a bona fide resident of France during the year 1946. Petitioner also assigned as error the disallowance of certain entertainment, travel and interest deductions pertaining to the year 1947 but introduced no evidence thereon. At the trial certain procedural motions were made on behalf of both parties, which notions were taken under advisement by the Court. Findings of Fact Elliot D. Sass, the petitioner, is and has been at all times pertinent hereto a citizen of the United States. He never contemplated giving up his American citizenship. He filed no United States income tax return for 1946. His 1947 return was timely filed with the collector of internal revenue for the third district of New York. For several years *43 prior to 1945, Sass was employed by the American Red Cross, serving primarily in North Africa and Italy. His work was in connection with transportation and supply. His employment with the Red Cross terminated in February or March of 1945. Thereafter Sass worked for several months as a salesman for Roditi and Sons of New York. They were in the importing-exporting business. In the late summer of 1945, Sass began to seek other employment. He applied for an overseas position with the American Jewish Joint Distribution Committee, Inc. (hereinafter referred to as J.D.C.). His application was accepted in the latter part of October, 1945. Petitioner was on J.D.C.'s payroll from this time. An official of J.D.C. wrote Sass a letter setting forth the terms of the contract. This letter reads: "October 23, 1945 "Mr. Elliot D. Sass, 1417 Avenue K, Brooklyn, N. Y.
"Dear Mr. Sass: "I am pleased to confirm our arrangements for your services on the Overseas Staff of the J.D.C. As agreed upon, your salary will be $5,000 per annum. "In addition, you will receive a per diem allowance to be decided upon by our European headquarters, and be covered by insurance during the term of your overseas *44 service. "Your appointment is subject to your ability to secure a passport, and to your being in good physical condition. "You understand, of course, that you will be expected to remain at your overseas post for at least one year and must be available for movement to any spot in which you will be considered most helpful in the opinion of Dr. Joseph J. Schwartz, Director of our European Activities, though your primary responsibility will be in the organization and transportation of supplies. "We expect to hear from you as soon as possible when you can start with us. "It goes without saying that we look forward to your association with us. "Sincerely yours, /s/ Louis H. Sobel, Louis H. Sobel, Assistant Secretary" At the time petitioner made application for an overseas position with J.D.C., he was informed that his wife would be sent to Europe to join him as soon as arrangements could be made. He arrived in Europe on December 23, 1945, to assume his duties. His wife, Henrietta, was not allowed to accompany him at that time. She joined him thereafter, arriving in France on April 21, 1946. Sass had stated on his passport application that his stay abroad was indefinite. *45 When he was applying for a job with J.D.C., Sass talked with his wife about the possibility of remaining permanently in Europe. Shortly before this time, they had lost their child, and they agreed that it would be a good idea to start afresh in new surroundings. They lived in an apartment in Brooklyn, for which they paid $45 per month. They gave up this apartment after Sass departed for France. Henrietta disposed of part of their furniture and arranged to have the remainder shipped to Europe. Petitioner never relinquished his account with the Chase National Bank in New York, and he had no bank account in Paris. Before his wife's arrival, Sass obtained a housekeeping apartment in a Paris hotel. After her arrival, Henrietta was actively engaged in housekeeping and did the cooking, laundry, cleaning and shopping. They lived in this apartment continuously until their return to the United States in April of 1947. Petitioner and his wife entertained both Americans and French acquaintances and friends at their apartment. They had two tutors in order to learn French and took lessons several times a week at their own expense during their entire stay. Henrietta attended a house of worship *46 regularly and petitioner often went with her. He obtained a license to operate a motor vehicle in France. Upon his arrival in France, Sass applied for an identification card. These cards were issued in three categories - temporary residence, ordinary residence and permanent residence. This classification was based on the intended duration of the alien's stay. The temporary residence card was for persons intending to stay one year or less. This card could be renewed. The ordinary residence card was for three years. The permanent residence card was for ten years and could only be issued after the alien had been a resident of France for three years. Sass applied for and was granted an ordinary residence card. When Henrietta joined the petitioner, she also received an ordinary residence identification card. She informed the authorities at that time that her stay was to be indefinite. Sass was head of the supply department of J.D.C. in Europe. His duties included purchase, storage, and shipment of relief supplies to various countries. When the petitioner departed for France in 1945, it was his intent to establish a permanent residence in France, or elsewhere in Europe. He intended *47 to work for J.D.C. for at least one year and probably thereafter. He planned to find other employment when he should leave J.D.C. and remain in Europe. In June or July of 1946, Sass first met Jean Salvaj through a mutual friend in Switzerland. Jean Salvaj was a director and stockholder in Salvaj and Co. This concern was a "producer's agent", engaged in buying and selling materials, such as foodstuffs and clothing, for various principals throughout Europe. It was discovered that the petitioner, in his work for J.D.C., met various suppliers with whom Salvaj was interested in doing business. Sass gave the names and addresses of these suppliers to Salvaj. Although there was no contract, and, at that time petitioner expected no pay, Salvaj and Co. set apart for Sass a part of their commission on business transacted through suppliers whose names he furnished. This type of business has no common counterpart in the United States. It is a legitimate business activity and was not a "black market" operation. Approximately six weeks after the initial meeting, Sass was informed that Salvaj and Co. had $3,000 for him for services rendered. Thereafter, he made numerous trips to Switzerland and *48 furnished Salvaj with additional names. In September or October, 1946, petitioner's work for J.D.C. changed character so that he did not travel as extensively as before. He so informed Salvaj, who decided that an accounting was in order. In September or October, 1946, the accounting was had and Sass was informed that he was entitled to approximately $52,000 for his services. Salvaj and Co. offered Sass the cash at that time but he requested them to keep the money subject to his order. Salvaj and Co., at all times thereafter, considered that the money belonged to Sass and that they held it by and at his order. It was not unusual for agents in petitioner's position to leave money earned with Salvaj and Co. subject to the agent's order, as Sass did. From time to time Sass charged bills against the amount and drew down various sums, the last remittance to petitioner being made in September, 1947. Early in 1947, it was decided by the J.D.C. to make a change in the supply department. Sass was notified to this effect by Dr. Schwartz. He began to search for another business connection in Europe. Salvaj and Co. did not have a place for him but they furnished him with names of various principals *49 who might be interested. None of these leads resulted in a job. Petitioner and his wife returned to the United States in April of 1947. They did not give up their apartment in Paris until their departure for America. Petitioner worked for a time in New York City after his return from France. Thereafter he went to Cuba, Panama and Brazil. During his stay in France, petitioner paid no income tax to the French Government. He kept his passport current at all times. He purchased no real estate in France. None of the income here involved was paid by the United States or any agency thereof. We find as ultimate facts that the income received by petitioner from J.D.C. as salary and as commissions from Salvaj and Co. during 1946 was earned income within the meaning of section 116(a)(3) and that it was received in 1946. Petitioner was a bona fide resident of France during 1946. Opinion VAN FOSSAN, Judge: The main issue in this case is whether or not petitioner was a bona fide resident of a foreign country within the meaning of section 116(a)(1)[1] during 1946. Petitioner was physically present in France during the entire taxable year involved, except for short business trips to other *50 European countries. It is undisputed that the salary earned from J.D.C. was earned income from a source without the United States. The same is conceded to be true of the commissions paid by Salvaj and Co. We have found as a fact that these commissions were paid to petitioner in 1946 and not in 1947. *51 On the above issue as to residence, the case is similar in principle to Burlin B. Hamer, 22 T.C. 343. In the Hamer case, petitioners lived in China during the year in dispute. They traveled on U.S. passports; maintained a bank account in the United States where part of their salaries was deposited; they lived in rented housing and participated to some extent in community activities. They did not pay income taxes to a foreign government, purchase a house, nor apply for citizenship there. They intended to stay for a period "of indefinite but protracted duration." All of the above facts are the same in the instant case except as to intent. As to intent, petitioner's case is much stronger than the Hamer case. Petitioners in this case intended to live abroad permanently. This intent existed prior to and during the entire year 1946. Sass was in Europe less than two years. He was unsuccessful in securing other employment in Europe when he severed connections with J.D.C. in 1947, although he made a real effort to do so. Petitioner's actions subsequent to the taxable year involved are corroborative of petitioner's true intention during the taxable year. Respondent has *52 argued vigorously that petitioner's employment by J.D.C. actually ended in 1946 and that he was thereafter merely sojourning in Europe. The facts do not support this contention. Section 116(a), Internal Revenue Code of 1939, has been fully discussed by this Court in three recent cases. Burlin B. Hamer, supra; Fred H. Pierce, 22 T.C. 493 ( June 8, 1954, and Leigh White, 22 T.C. 585 (June 17, 1954). No useful purpose would be served by repeating the discussion found therein. On the facts of this case, we hold that the income earned by petitioner during 1946 is excludible from gross income under the cited section. Since petitioner had no income which had to be reported, there can be no penalty for failure to file a return. The respondent erred in imposing such a penalty under section 291, Internal Revenue Code of 1939. The determination is accordingly disallowed. The conclusions announced above make it unnecessary to discuss the procedural motions made by the parties. Decision will be entered under Rule 50. Footnotes
1. SEC. 116. EXCLUSIONS FROM GROSS INCOME. In addition to the items specified in section 22(b) the following items shall not be included in gross income and shall be exempt from taxation under this chapter: (a) Earned Income from Sources Without the United States. - (1) Foreign Resident for Entire Taxable Year. - In the case of an individual citizen of the United States, who establishes to the satisfaction of the Commissioner that he is a bona fide resident of a foreign country or countries during the entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) if such amounts constitute earned income as defined in paragraph (3); but such individuals shall not be allowed as a deduction from his gross income any deductions properly allocable to or chargeable against amounts excluded from gross income under this subsection.↩